Arcy Plastic Laminates v Travelers Indem. Co. of Ill. (2004 NY Slip Op 50486(U))

[*1]

Arcy Plastic Laminates v Travelers Indem. Co. of Ill.

2004 NY Slip Op 50486(U)

Decided on June 4, 2004

Supreme Court, Albany County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 4, 2004

Supreme Court, Albany County
ARCY PLASTIC LAMINATES and FOUR R SUPPLY., INC., Plaintiffs,
 against
TRAVELERS INDEMNITY COMPANY OF ILLINOIS, Defendant.
5400-01

Phil A. Rodriguez, Esq.
Attorney for Plaintiff
38 North Ferry Street
Schenectady, New York 12305
ROBINSON & COLE
Attorneys for Defendant
Gregory Varga, Esq., of Counsel
280 Trumbull Street
Hartford, Connecticut 06103-3597

Louis C. Benza, J.
Plaintiff Arcy Plastic Laminates (hereinafter Arcy) is a manufacturer of laminate kitchen counter-tops. Since 1994, Arcy has conducted its business at premises located at 100 North Mohawk Street, Cohoes, New York. Sometime thereafter, Arcy entered the granite counter-top [*2]business as an intermediary between customers and another manufacturer. In December 1998, a wholly-owned subsidiary of Arcy, plaintiff Four R Supply, Inc. (hereinafter Four R), purchased Stonemaster, a company that manufactured granite counter-tops. Thereafter, Four R manufactured its product at premises located at 10 Walker Way, Albany, New York. Four R, however, conducted all bookkeeping and accounts receivable/payable at the 100 North Mohawk location. In December 1998, defendant issued a renewal insurance policy naming plaintiffs as insureds and covering them for certain losses. There is no dispute between the parties concerning what coverages were issued. On May 17, 1999, the 100 North Mohawk Street location was totally destroyed by fire. As a result of the fire and pursuant to the insurance policy, defendant paid Arcy $793,191.14, of which $193,954.46 was for business income loss and $80,751.54 was for extra expense.
In November 2001, plaintiffs commenced this action alleging that defendant breached the plaintiffs' insurance policy by undervaluing the claimed loss of business income and failing to reimburse plaintiffs for post-fire extra expenses. The controversy between the parties centers around two issues: (1) whether the income of Four R and Arcy should be combined in determining the total business interruption loss sustained by Arcy as a result of the fire loss; and (2) whether the methodology used by Arcy's expert in determining the amount of the loss was reasonable based on the financial history of Arcy. After a three-day bench trial in January 2004, the Court determines the following.
Initially, plaintiffs contend that defendant should be estopped from disclaiming coverage to Four R, a named-insured under the policy, for loss of business income and extra expenses. Specifically, plaintiffs argue that until trial, defendant has always treated the loss as a joint loss of business income for Arcy and Four R, as evidenced by defendant's accountant using plaintiffs' combined business income in his analysis and loss evaluation, except with regard to his initial findings which were based only on Arcy's loss. 
Defendant counters that Four R's revenue should not be included in the formula for determining loss revenue because Four R did not (a) sustain a direct physical loss to covered property, (b) that there was no suspension of Four R's operations because of the physical loss to Arcy's Mohawk facility, and (c) Four R did not lose any business income as defined in the policy, as no suspension of its business occurred as a result of Arcy's fire loss at the Mohawk facility.
Estoppel
To qualify for the protection of equitable estoppel, a party must establish that its adversary engaged in:

 "'(1) Conduct which amounts to a false representation or concealment of material facts ... which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive of the real facts. As related to the party claiming the estoppel, [the elements] are: (1) [l]ack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially (Brelsford v USA, 289 AD2d 847, 849 [2001] [citations omitted]).
[*3]
Initially, although defendant argues that estoppel was not pleaded by plaintiffs, the record reveals that it was not until the trial that defendant's accountant, Mark Perlmutter, prepared his testimony and exhibits based on Arcy's loss without considering Four R's income (T:414-415).
In any event, throughout his testimony, Permutter contended that it was only after a submission to Arcy of his initial report, wherein he analyzed the loss solely on Arcy's income, that he recalculated the loss on a combined basis. Permutter did the recalculation because Arcy's representatives advised him that Four R's business should be combined as some business of Four R had been conducted out of the Mohawk premises. Perlmutter further testified that no one told him that granite tabletops were not sold or manufactured at the Mohawk location at the time of loss. Rather, he was informed that the manufacturing facilities at both sites could do both granite and laminated tops. A review of Arcy's ledgers by Perlmutter, which recorded sales, indicated that Arcy was recording sales of granite out of the Mohawk facility before Arcy purchased the Walker site. While this facially gives credence to Arcy's argument, Permutter, however, was never told that those granite sales were sales from granite orders outsourced to others for manufacturing. It was only after he received all of the records, including records of sales subsequent to the loss, that he discovered the recorded granite sales in Arcy's ledger came from the outsourcing of granite tabletop (Tr. 336-338).
In light of these findings, it is difficult to see how plaintiffs could be prejudiced by the change in defendant's position as Arcy's representatives were not forthright with the information concerning what manufacturing and sales were occurring at the Mohawk facility. Further, plaintiffs cannot allege surprise or prejudice as a result of Perlmutter's evaluation of business-loss based solely on Arcy's income, as that was the method used by Perlmutter in his original submission (Tr. 337). Moreover, Arcy was aware of the actual facts that would have, if known to defendant, corroborated Perlmutter's methodology of calculations of Arcy's losses originally submitted to Arcy. As such, the Court finds that plaintiffs have failed to establish any of the requisite elements of equitable estoppel for precluding defendant's proof that Four R, under the provisions of the insurance policy, had not sustained any losses as a result of the fire at the Mohawk facility.
Four R's Claim For Loss of Business Income:
Turning to the merits of Four R's claim for loss of business income. The policy issued to plaintiffs provides coverage for loss of business income on the occurrence of the following conditions:

COVERAGE-BUILDING, BUSINESS PERSONAL PROPERTY AND BUSINESS INCOME
We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.
We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.' The suspension must be caused by direct physical loss of or damage to property at the premises described in the Declarations.
[*4]
The evidence is clear that Four R's manufacturing of granite tabletops was conducted at the Walker Way facility and that none of Four R's equipment or inventory was damaged by the fire which occurred at the Mohawk facility on May 17, 1999 (Tr. 277-281; 303). The only evidence produced by plaintiffs to connect the loss to Four R was the testimony of plaintiffs' Vice President and Chief Operations Office, Rudolph Ceccucci. Ceccucci testified that certain records related to invoicing from granite tabletop sales were damaged in the fire and that other activities related to Four R were conducted out of the Mohawk facility such as computer, customer and delivery services. The record, however, also establishes that all these activities were removed to the Walker Way facility after Arcy purchased Stonemaster some 5½ months before the fire loss (Tr. 63; 65; 71; 275-277; 280 281; 298; 302-303). At most, the Court finds that Ceccucci's testimony, regarding Four R's administrative activities conducted at the Mohawk facility, was vacillating and unsure. Regardless of this inconsistency, Ceccucci testified the only damage to Four R's property consisted of papers, samples and displays, and he could not explain how this loss interfered with Four R's business after the fire, especially after testifying that Four R was still manufacturing after the fire without interruption (Tr. 98-99; 284-286).
It is also noted that Steve Mitchel, the former owner of Stonemaster and subsequent manager of the granite tabletop business at the Walker Way facility also testified at trial. He stated that as of August 1998, Arcy produced all of the granite business at the Walker Way facility (Tr. 271). Mitchell also testified that the fire at the Mohawk facility did not affect what he was doing on a day-to-day basis at Walker Way, and that the granite operation was not affected by the fire (Tr. 284). Further, Mitchell stated that the fax machine for receipt of granite orders was moved to Walker Way before the fire, and that no granite sales were lost as a result of the fire (Tr. 284-285). Mitchell also corroborated the fact that Arcy never manufactured granite tabletops until it took possession of the Walker Way facility (Tr. 291). In reference to the paperwork involving the granite business, on cross-examination, Mitchell stated that all the master files were maintained at Walker Way and not at the Mohawk facility (Tr. 298; 302). The out-sourced granite work was also transferred to Walker Way and, prior to the fire, no granite was shipped to the Mohawk facility (Tr. 303). In February 1999, Paul Mayo was hired to manage the Walker Way facility. Mitchell and two other employees reported to Mayo (Tr. 71-72; 276). The granite counter-top business was serviced by an off-site sales force; however, none of them operated out of the Mohawk facility (Tr. 275). At most, at the time of the fire, the only function of Four R conducted at the Mohawk facility for granite tabletop manufacturing consisted of bookkeeping (Tr. 61-62; 280-281). All other services, including fax order for granite tabletops, receipt of granite, granite installers and outsourcing of granite manufacturing and receipt of these orders were all conducted at the Walker Way facility (Tr. 72; 275-277).
Finally, the insurance policy provided that defendant insured Four R only for loss of business personal property up to $100,000. The Walker Way building proper was not covered (Tr. 200-201; Ex. 60). Therefore, Four R's coverage was separate and distinct from Arcy's coverage, and was on a specified limited basis (Tr. 199-201).
Based on the preponderance of the evidence, Four R has failed to establish that it [*5]suffered direct physical loss or damage to its business personal property, or that there was any suspension or cessation of Four R's business as a result of the fire (Tr. 95; 275-277, 284-285; 300-301). Further, any decline in Four R's revenues did not result from the fire loss at the Mohawk facility, particularly in light of Mitchell's testimony that Four R was unable to sustain the customers of Stonemaster, as well as the poor quality control of granite tops being manufactured and other operational problems (Tr. 273-274; 279-283).
As such, Four R is not entitled to any recovery based on the provisions of its insurance contract with defendant (see, 54th St. Ltd. Partners, LP v Guaranty Ins. Co., 306 AD2d 67 [2003]; Roundabout Theatre Co., Inc. v. Continental Cas. Co., 302 AD2d 1 [2002]).
Business Interruption Claim
Notwithstanding the foregoing, even if Four R's income was included, plaintiffs would not prevail. The Court analyzed the evidence submitted by the financial experts of both parties and makes the following findings. Calculating business income loss is a two-step process. The first step is to determine the sales lost during the period of restoration (Tr. 326), and then apply an appropriate profit percentage rate to the lost sales to arrive at the actual loss of income (Tr. 327). In calculating the rate of profit, the insurance policy requires that payroll is to be treated as an expense after 90 days following the loss, as the first 90 days of payroll are included in the calculations which determine business income and are paid by the insured as part of the lost sales occurring during the 90-day period immediately following the fire (Tr. 226-227).
Plaintiff's expert, Michael Hannah, practices mostly tax law and accounting. He has virtually no experience in the presentation of business interruption claims (Tr. 121-122), and had never testified as an expert in a business interruption lawsuit (Tr. 119). Hannah reviewed plaintiffs' combined sales for the 12-month period prior to the fire, and 12-month period after the fire (Tr. 145-146). Hannah's assumption, that the combined sales for Arcy and Four R would have increased 28% were it not for the fire, was based on a growth factor which could not be substantiated by plaintiffs' historical experience during any period prior to the fire, including Arcy's 52-year history (Tr. 398-399; Ex. P). The 28% growth factor failed to include the poor performance of both companies for 5½ months before the fire. Further, Hannah's opinion that the sales performance for this period was an "aberation" and should not be used for a long range forecast in the business, without stating the reason therefor (Tr. 127-129), is not justifiable. This is particularly true in light of the significant downtrend for the past years in Arcy's laminated counter-top business (Ex. P- R), and the leveling off of Four R's granite counter-top sales due to problems not relevant to the fire (Tr. 279-283). Additionally, the use of sales figures for 1996 and 1998 was not a reliable basis for assumption of a 28% growth rate, as those years were the start-up period for Arcy's granite counter-top/out-source business. Further, absent any reliable factors, especially in light of the decreases in the latter years, that Arcy would be able to maintain this growth factor, the weight of Hannah's analysis is diminished.
The growth rate is further suspect by Hannah arbitrarily adding the sum of [*6]$200,000.00 to the 28% profit margin to increase the projected sales revenue.[FN1] Had Hannah not included the additional $200,000.00 figure, his calculations of combined profits of $266,411.00 would be reduced to less than $100,000.00 (Tr. 147), an amount less than what was paid by defendant (Ex. SS; Tr. 207). When compared with the historical profit rates of (-) 2% to 2% for the company, the 28% seems grossly exaggerated (Tr. 399). As to the total loss sustained under the business loss provision of the policy, Hannah added a sum of $470,655.00, as a defined fire loss debits based on Arcy's May 31, 2000 financial statement (Ex. 8). This amount was added without explanation (Tr. 163-166).
The testimony of Perlmutter, however, designates the addition as a deferred asset to be received by Arcy under defendant's policy for direct damages sustained by Arcy. Hannah agreed. In other words, it was not a deferred receivable due to Arcy for prior sales (T. 401). The inclusion of the $400,000.00, and the deferred item of $470,655.00, diminishes the credibility of Hannah's findings. The Court finds that Perlmutter's analysis and a finding of 2.56% sales growth factor for both companies to be more reliable, and applying that rate results in a total loss of Business Income of $193,954.46, the amount actually paid by defendant (Ex. SS; Tr. 207).
As the inclusion of Four R's income was essential in the overall analysis of the loss of income for Arcy, and Arcy failed to establish any loss beyond that which was previously paid by defendant, Arcy's claim for additional loss of business income is dismissed.
Extra Expenses Claim:
The categories of expenses to be paid as a result of a loss are: (1) relocation cost to Arcy for moving to temporary facilities; (2) improvements made by Arcy at the temporary location; (3) relocation from the temporary facility to Arcy's new permanent site.
"Extra Expense" as defined in the policy is:
I.Extra Expense

We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the premises described in the Declarations, including personal property in the open (or in a vehicle) within 100 feet of the described premises, caused by or resulting from a Covered Cause of Loss.,
Extra Expense means expense incurred:
[*7]
(1)To avoid or minimize the suspension of business and to continue "operations":
(a)At the described premises; or
(b)At replacement premises or at temporary locations, including:
i.Relocation expenses; and
ii.Costs to equip and operate the replacement or temporary locations. 
(2)To minimize the suspension of business if you cannot continue "operations."
(3)(a)To repair or replace any property; or
(b)To research, replace or restore the lost information on damaged valuable papers and records to the extent it reduces the amount of loss that otherwise would have been payable under Business Income.

We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance (Ex II).
The burden of proving that rejected expenses are covered by the policy is upon plaintiffs (Chase Manhattan Bank v The Travelers Group, Inc., 269 AD2d 107 [2000]; Borg Warner Corp. v. Ins. Co. of No. America, 174 AD2d 34 [1992], lv denied 80 NY2d 753 [1992]). The claims for extra expenses are as follows.
1.Claim for Labor Inefficiencies:
Due to difficulties sustained by Arcy in manufacturing its product at the temporary Mohawk site from May 1999 through July 2000, plaintiffs argue Arcy is entitled to additional labor costs as additional expenses (T. 45). For this period of time, Ceccucci testified that Arcy anticipated a 15% to 16% direct labor cost and its actual experience was a 30% direct labor cost. Ceccucci attributed the additional cost to use of his direct labor force for moving and setting up Arcy's equipment from the loss site to the temporary site, the inefficiency of the site for Arcy's operation, and Arcy's manufacturing line could not be established due to the size of the temporary site. Additionally, the workplace was without heat until December 1999 (T. 45-46). Other than the business records of Arcy, no documentary or expert proof was submitted to support the loss of efficiency claims. Further, the Court could not determine the amount of any of Arcy's losses incurred for said inefficiencies from the testimony submitted. The testimony of Ceccucci did not specify whether his uncorroborated increase in labor cost took into [*8]consideration that, as part of the total business interruption loss, whether Arcy was compensated for its entire payroll for the first 90 days following the loss. As the record reveals Arcy was compensated, Ceccucci's "estimate" was highly inflated. As such, Ceccucci's testimony was not sufficient to carry plaintiffs' burden of proof on this issue, and no recovery can be had for this loss.

2.Initial Expense on Line of Credit:
Plaintiffs have failed to establish by a fair preponderance of the evidence that the interest paid Arcy's revolving line of credit constituted necessary expenses incurred to minimize the suspension of its business and loss of business. The Court makes this determination in light of defendant's direct payments to Arcy of $300,000, without use restrictions, and indirect payments to Arcy's vendor of $50,000 before December 1999 (Ex. SS; Tr. 195-196); 320-321). Moreover, there was no evidence corroborating Ceccucci's testimony that he would not have been able to carry on the business of Arcy without financial help (Ex. TT; p. 24-25).
3.Improvements to New Permanent Facility in Waterford, NY:
For the same reasons stated above and based on the testimony of defendant's general adjustor, Maurice Talbot, Arcy's claims for these items of damages are also dismissed (Ex. TT; p. 24-25). Talbot testified that expenses incurred more than one year after the loss are not covered by the policy and, moreover, such payments, if made, would be duplicative of payments made for loss of leasehold improvements (Tr. 219; Ex TT - extra expenses -3b).
4.Purchase of Store, Tools & Equipment:
In addition to the reasons stated above, Arcy was also paid by defendant for losses incurred for business personal property, which includes inventory, stock, tools and other items owned by Arcy and used in its business (Tr. 226). It is noted that under the insurance policy, loss of business personal property was limited to $468,000.00, and defendant paid Arcy in excess of the policy limit in the amount of $484,724.46 (Tr. 201-202; Ex. TT, p. 19, §A.1). As such, Arcy's request for damages as to this item of loss is denied.
5.Miscellaneous Expenses:
Arcy submitted no direct testimony on this loss. The evidence covering denial of these miscellaneous expenses which included: towing charges, American Express charges, delicatessen food bills, bills from Hooters in Buffalo, survey cost for Arcy's permanent location were all denied by defendants (Tr. 218-226; Ex. M). The basic reason for denial was that the expenses did not meet the policy's definition of extra expenses, and some of the expenses took place after the period of restoration. Given that this testimony was unrefuted, Arcy's claims for miscellaneous expenses is denied.
As the preponderance of the evidence established that defendant paid Arcy for all of its losses covered by the contract of insurance executed by the parties, defendant's motion to dismiss, made at the close of the evidence, is granted. Submit judgment.
[*9]
Albany, New York_________________________________
June 4, 2004Hon. Louis C. Benza, JSC
Footnotes

Footnote 1:The $200,000.00 was a projection made by Arcy's principals based on its purchase of Stonemaster. A projection which was made without production of any documents indicating when, how or on what information was relied in making the projection. Hannah never verified this projection. He just accepted it, without explanation, from Arcy's officers. Certainly, Hannah's testimony did not support this projection (Tr. 273).